# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAMES RAMOS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 08 CV 4478 |
| v. ) | |
| ) | HONORABLE DAVID H. COAR |
| COMMONWEALTH EDISON COMPANY ) | |
| d/b/a COMED, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Ramos ("Plaintiff" or "Ramos") has made claims of age discrimination and national origin discrimination pursuant to 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 et seq. ("Title VII"), and the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621 et seq. Defendant Commonwealth Edison Company d/b/a ComEd ("Defendant" or "ComEd") now brings this motion for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons stated below, the motion is granted.

### I. Jurisdiction and Venue

This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1343(4). Venue is proper under 28 U.S.C. § 1391(a).

### II. Facts

The facts below are taken from Defendant's Rule 56.1 Statement of Undisputed Material Facts ("DSOF") or Plaintiff's Rule 56.1 Statement of Undisputed Material Facts ("PSOF"). They are undisputed unless otherwise noted.

   a. Background

Plaintiff was born on April 27, 1958. PSOF ¶ 81. Plaintiff testified that he is half Caucasian and half Puerto Rican; his father was born in Puerto Rico and his mother was born in the United States. *Id.*; Ramos Dep. 4:20-5:4.

Defendant ComEd provides electricity to the northern part of Illinois, including Chicago and the greater Chicago area. Plaintiff began working for ComEd on January 7, 1985 as a C Plant Operator. PSOF ¶ 82. In 1989, Plaintiff was promoted to overhead lineman. As a lineman, Plaintiff worked "on the electrical distribution system in the overhead and underground construction" and was responsible for "keep[ing] the lights on." Ramos Dep. 24:13-17; 25:15-25:21. When Plaintiff entered the overhead department as a lineman, he signed a form that stated that Plaintiff "had been informed that because of the nature of our business and our obligation to provide service to our customers, callbacks are 'a way of life' in the Overhead Department," and that he recognized his "obligation to make every effort to respond promptly to emergency callbacks." DSOF ¶ 9. Plaintiff was promoted to the position of crew leader in 2003. He continued to perform essentially the same work as he did as a lineman, except he led a crew of one or two other employees. As a crew leader, it was again Plaintiff's job to keep the lights on. He was technically assigned to a reporting location in Skokie, Illinois, but actually reported to a location in Highland Park, Illinois. *Id.* at ¶ 11.

Plaintiff directly reported to Phil Russell between 2006 and 2007, Dzenan Vojnikovic (Caucasian, 36 years old) in early 2006 and in the second half of 2007, and Mike Kikendal in

2006. PSOF ¶ 84. Vojnikovic was responsible for supervising crew leaders, including Plaintiff. Through May 2008, Vojnikovic reported to Rommel Noguera, who was born in 1964. *Id.* at ¶ 85.

### b. The ARCOS System

As a regulated public utility, ComEd has an obligation to restore electrical service to its customers as soon as possible following a service outage. To make emergency repairs, restore electrical service, and otherwise meet workload needs, ComEd telephones or "calls-out" employees to return to work overtime. DSOF ¶ 5. In 2003, ComEd implemented an automated web-based system called the Automated Roster Callout System ("ARCOS"), a method of summoning employees to overtime "callout" jobs. Approximately 2,500 ComEd employees are subject to ARCOS. Employees can program up to three telephone numbers, including a pager number, into the system. When a callout is activated, the system automatically calls employees in the relevant job classification and geographic area in reverse order of the number of hours the employee has been paid for overtime during the calendar year. If an employee does not answer the first programmed number, the system leaves a recorded message but also calls any other number programmed by the employee, and leaves a similar message, before calling the next employee.

An employee has 20 minutes to respond to the callout; a failure to respond within that period is treated as a declined callout. The system automatically tracks whether the employee is credited for accepting a call, or charged for declining a call. Employees can be excused for various reasons, including a vacation, sick leave, or being at work. ComEd measures ARCOS performance and administers discipline by callout periods. DSOF ¶ 13, 14. The program included progressive discipline if the employee did not accept the required number of callouts

per measurement period: first a formal warning, then a one-day suspension, a three-day suspension, a five-day suspension, and then termination. *Id.* at ¶ 15.

The ARCOS callout percentage of each Highland Park employee was posted on the bulletin board where Plaintiff reported each day at the beginning of the shift. Plaintiff knew what was expected of him and what he had to do with respect to callouts in order not to incur discipline. *Id.* at ¶ 18. He testified that he "kept track of his callout acceptance percentage" and "tried to keep [his] percentage at what was required to keep from being disciplined." Ramos Dep. 87:3-7. Plaintiff understood that all of the crew leaders and linemen across the company were subject to the same work expectations under ARCOS. *Id.* at ¶ 13. Plaintiff received instruction and training about the ARCOS program. He understood the program's progressive discipline system. *Id.* at ¶ 15. Plaintiff programmed only his home phone to receive callouts. He did not program either his company-issued cell phone or his wife's cell phone to receive callouts. He did not request a free pager from ComEd. *Id.* at ¶ 16. Plaintiff understood that if he thought he was wrongly charged with a declined callout, he had to complete a callout exception form to have it excused. *Id*. at ¶ 17.

### c. Plaintiff's Performance Record Under the ARCOS System

According to the affidavit of Michael Mason, the ARCOS Program Administrator, during the third quarter of 2003, employees had to respond to at least one callout to avoid an informal warning. Mason Aff. Ex. 1. Plaintiff's callout response record for that period was 0 out of 25 callouts. Ramos Dep. Ex. 6 (Bates #000222). Plaintiff received an informal warning letter setting out his callout response rate in the third quarter of 2003 and stating that unless he accepted at least one callout in the fourth quarter of 2003, he would receive a formal warning. *Id.*

Plaintiff's callout response record during the fourth quarter of 2003 was 0 out of 23 callouts. Ramos Dep. Ex. 7 (Bates #000224). Ramos received the first step in the ARCOS progressive discipline system, a formal warning form letter setting out his callout response record during the fourth quarter of 2003 and stating, "If . . . your callout response continues to remain at zero for the first quarter of 2004, you will then move to the next step in the progressive discipline process and will be issued a one-day suspension." *Id.*

Plaintiff's callout response during the first quarter of 2004 was 0 out of 21 callouts. Plaintiff received a one-day suspension form letter setting out his callout response record during the first quarter of 2004 and stating that unless he accepted at least 10 percent of the callouts he received in the second quarter of 2004, he would receive a three-day suspension. *Id.* at ¶ 21.

Plaintiff's callout response for the second quarter of 2004 was 1 out of 19, a five percent acceptance rate. Ramos Dep. Ex. 9 (Bates #000228). Defendant alleges that Plaintiff received a three-day suspension form letter setting out his callout response record during the second quarter of 2004 and stating that unless he accepted at least 10 percent of the callouts he received in the third quarter of 2004, he would receive a five-day suspension; Plaintiff argues that he never received a three-day suspension pursuant to the progressive discipline policy for ARCOS. DSOF ¶ 22. Regardless of whether he actually served this suspension, Plaintiff does not dispute that he had notice that his callout response record from the second quarter of 2004 was inadequate, warranting discipline under ARCOS.

Plaintiff's callout response record for the third quarter of 2004 was 0 out of 8 callouts. As a result, Plaintiff was suspended for five days, and he received a letter stating that he was "at the last step of progressive discipline for [his] unacceptable callout response record" and that the next disciplinary step was Plaintiff's termination. DSOF ¶ 23. Plaintiff claims that with the

assistance of Union Steward Brian Willms, he grieved the five-day suspension, but Defendant contends that the evidence does not support Plaintiff's argument. DSOF ¶ 23; PSOF ¶ 106. This will be discussed further below.

Effective the first measurement period of 2006, there were three significant changes to the ARCOS program that reduced the employee's burden under the program. First, "First Call Free" was implemented. Under First Call Free, a call is not "chargeable" against the employee unless a sufficient number of employees fail to accept the callout on the first pass through the overtime list and the employee still does not accept the callout after being called again on the second pass through the overtime list. Second, "Remediation" was implemented. Under that program, an employee can work off a step of discipline (e.g., move down from the five-day suspension step to the three-day suspension step) by accepting 35% of all chargeable calls during two consecutive measurement periods. Third, an employee has to receive at least seven chargeable calls during a six-month period for the measurement period to count against the employee for purposes of discipline. Before January 1, 2006, the measurement period was either 3 months or 6 months, and the employee had to receive a minimum of chargeable calls for the measurement period to count. DSOF ¶ 26.

Plaintiff met or exceeded the required callout response rate in the measurement periods from the fourth quarter of 2004 until the second half of 2007. However, during the second half of 2007, Plaintiff's response record was not up to par. In early 2008, Plaintiff was informed that his callout record was 2 for 11, that he had failed to accept 35% of unexcused calls as required, and that he was at the final disciplinary step of termination. DSOF ¶ 32. ComEd Regional Construction and Maintenance Manager Rommel Noguera assigned Emergent Work Supervisor Bill Nightingale, who had not directly supervised Plaintiff, to investigate and determine whether

there were any extenuating circumstances that excused Plaintiff's poor callout performance. *Id.* Plaintiff challenged six of the nine callouts that he declined in that period. *Id.* at ¶ 33. Nightingale reviewed the information that Plaintiff had provided in support of his challenges, and determined that one of those callouts should have been excused and three missed callouts were properly charged. For the remaining two callouts, Plaintiff claimed that he had missed them because he was in an emergency room with his teenage daughter.

On February 27, 2008, ComEd conducted a fact-finding conference with Plaintiff and two union stewards. DSOF ¶ 36. Throughout his employment, Plaintiff was a member of the International Brotherhood of Electrical Workers, subject to a collective bargaining agreement that set forth his terms and conditions of employment, including the protection of a grievance and arbitration procedure. DSOF ¶ 6; Ramos Dep. 24:23-25:14, 27:11-14, 44:8-45:21; Ramos Dep. Ex. 2. During the fact finding, Plaintiff contested his termination on several grounds, including that he thought was excused from accepting callouts because he had FMLA leave, and that the three-day suspension step of the ARCOS progressive discipline system had been skipped. Nightingale recorded his findings in a report and concluded that Plaintiff legitimately failed to make the 35% callout response rate requirement, and recommended that Plaintiff be discharged. He then forwarded this report to Noguera. DSOF ¶ 40. Noguera decided to excuse the two calls that Plaintiff challenged, but found that even after excusing these two calls, Plaintiff's callout response record for the second half of 2007 was still 2 out of 8 (25%), and still below the 35% threshold. DSOF ¶ 42.

Consensus telephone calls involving Noguera and upper management were held and a decision was reached to discharge Plaintiff due to his failure to satisfy ComEd's callout requirements. DSOF ¶ 45. Plaintiff was discharged on March 27, 2008. He was 49 at the time

of the discharge decision. He was allowed to use his vacation and floating holidays to remain on the payroll until he turned 50 so he would be eligible for early retirement. DSOF ¶ 47.

### d. Other Alleged Incidents of Harassment and Discrimination

Plaintiff also claims that, unrelated to the callouts, he was subject to discriminatory discipline, job assignments, and harassment based upon his race, national origin, and age. He alleges generally that he was continuously harassed until the end of his employment by his coworkers and supervisors even though he had made the harassing behavior known to Defendant since 2002. Pl.'s Resp. 2. Specifically, Plaintiff points to a few incidences of allegedly discriminatory treatment. First, Plaintiff claims that he was consistently assigned the less desirable "underground" jobs more often than his Caucasian comparatives.

Second, Plaintiff also alleges that he was the subject of unwarranted discipline, particularly when under the supervision of Vojnikovic. In 2002, Plaintiff was suspended indefinitely for threatening supervisor Todd Weaver. DSOF ¶ 61. Plaintiff was reinstated pursuant to a "Reinstatement Agreement" under which he was given a "last chance" warning and required to attend anger management counseling. DSOF ¶ 62. The Agreement stated, "If there is a future violation of the Company's violence in the workplace policy, you will be terminated and leniency will not be a consideration" and "this letter will be deemed to be a last chance agreement for maintaining your employment with the Company." *Id.* In March 2006, Plaintiff was suspended for five days and issued yet another last chance warning, and was directed by Vojnikovic to go to anger management classes over an incident that both parties characterized differently. Plaintiff contends that he received discipline merely for "folding his arms," which Vojnikovic read as an aggressive act. PSOF ¶ 93. This version is supported by the testimony of Plaintiff's co-worker David Unrein. Unrein Dep. 29:19-30:4. On the other hand, Defendant

contends that Plaintiff was acting in a threatening and insubordinate manner. Plaintiff's co-worker Randy Hudson, an African-American man, testified that Plaintiff was nose-to-nose with Vojnikovic during this incident and was excited and speaking with a raised voice. Hudson Dep. 72:4-74:9. Supervisor Nabil Shoman, who is half Hispanic, also testified that "after Jim learned that he was going on another trouble ticket he began to get loud and disruptive" and that he "approached [Vojnikovic] face-to-face only inches away with an intimidating manner." Ramos Dep. Ex. 21 (Bates No. 1590), Witness Statement of Nabil Shoman. In any event, Plaintiff received documented job counseling for insubordinate and threatening behavior as a result of this incident, which stated that "this notice is to formally inform you that the Last Chance Agreement you signed on November 8, 2002 remains in full effect" and stated that "any misconduct of the same or similar nature in the future will result in your immediate termination." DSOF ¶ 63.

On December 28, 2006, supervisor Phil Russell inspected a job in the field led by Plaintiff and discovered that Plaintiff was installing a high voltage cable on a transformer in a dangerous manner. ComEd conducted a fact-finding; based upon the findings, which included Plaintiff's own description of the installation procedure he followed, a consensus group determined that Plaintiff had performed the installation in an unsafe manner. DSOF ¶ 65. As a result of the December 2006 incident, Defendant required Plaintiff to take a three-phase lineman's test in order to maintain his employment. Plaintiff contends that no other comparable crewleader had ever been retested for three-phase work. Pl.'s Resp. 3.

On January 30, 2007, Russell telephone Plaintiff and directed him to report to ComEd's training facility to take the competency test. Plaintiff refused, repeatedly shouted "This is bullshit," and said that he would be at Russell's office the next day "to meet you eye-to-eye so be ready." DSOF ¶ 68. Despite Plaintiff's prior last chance agreements, Plaintiff received a five-

day suspension for anti-authoritative behavior for this conduct and was not terminated. Plaintiff does not dispute the facts surrounding this incident, but instead argues that his Caucasian comparatives engaged in similar acts of misconduct without being subject to similar discipline.

### III. Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 252; *see also Celotex*, 477 U.S. at 324. When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). This standard of review is applied to employment discrimination cases with "added rigor." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).

### IV. Analysis
#### a. Plaintiff's Termination

Plaintiff, a fifty-one year old man of Puerto Rican descent, argues that Defendant violated Title VII, 42 U.S.C. § 1981, and the ADEA when he was allegedly dismissed due to his race/national origin and age. To survive a summary judgment motion, an employee alleging employment discrimination must show incidents of illegal discrimination through either direct proof or, more commonly, indirect proof. *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003). Here Plaintiff does not claim to have any direct evidence of discrimination, and instead elects to proceed under the indirect method of proof.

The indirect method of proof is a burden-shifting approach, where the plaintiff bears the initial burden of establishing a *prima facie* case of intentional discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-06 (1973); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, (7th Cir. 2002); *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000); *Szymanski v. County of Cook*, 2002 WL 171977 at *5 (N.D.Ill.). Once the plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Szymanski*, 2002 WL 171977 at *5. If the employer satisfies that burden, the presumption of discrimination is rebutted, and the burden shifts back to the plaintiff to persuade the trier of fact either directly that a discriminatory reason more likely motivated the action or indirectly that the employer's articulated reason for the employment action is unworthy of credence and is but a mere pretext for intentional discrimination. *Id*.

In order to establish the *prima facie* case of employment discrimination under the *McDonnell Douglas* schema, a plaintiff must provide evidence that "(1) he is a member of a protected class under Title VII, (2) his work performance met the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly-situated employees

outside of the protected class were treated more favorably by the employer. *Goodwin v. Bd. of Trust. of Univ. of Illinois*, 442 F.3d 611, 617 (7th Cir. 2006). If a plaintiff proceeding under the indirect method fails to establish any one of the four factors of the *prima facie* case, the court generally need not proceed any further and summary judgment will be entered for the defendant. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 331 (7th Cir. 2002); *see also Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680-681 (7th Cir. 2002).

### i. Legitimate Expectations

Defendant contends that Plaintiff cannot meet his burden under the *McDonnell Douglas* burden-shifting scheme because he is unable to show that he met his employer's legitimate expectations with respect to the ARCOS system. Indeed, as a documented above, Plaintiff failed to meet the callout response rate requirements and was disciplined in accordance with the ARCOS progressive discipline policy, which culminated in Plaintiff's termination. Plaintiff offers two arguments in response. First, Plaintiff contends that Defendant did not follow the ARCOS discipline system because the three-day suspension step of the progression was skipped. Plaintiff's evidence for this is that his pay stubs from August 5, 2004, August 19, 2004, and September 2, 2004, do not reflect that he was docked three days pay for his inadequate callout response rate during the second quarter of 2004. However, this argument is a nonstarter. ComEd does not dispute that Plaintiff never actually served the three days off without pay; Defendant's position is that in lieu of serving his three-day suspension, Plaintiff was not paid for three days of vacation that he took. Nightingale Aff. ¶ 10. Plaintiff does not contest that his callout response record from the second quarter of 2004 was inadequate, warranting discipline under ARCOS. Thus whether Plaintiff accidentally benefitted from Defendant's enforcement

oversight is irrelevant to whether Plaintiff failed to meet Defendant's expectations and deserved to be moved to the next disciplinary step.

Second, Plaintiff argues that he need not establish the second prong of his *prima facie* case in order to prevail given that Plaintiff claims that Defendant applied its employment expectations in a discriminatory fashion. Indeed, the Seventh Circuit has carved a narrow exception excusing plaintiffs from showing that they met their employer's expectations "when a plaintiff alleges that other employees were also not meeting the employer's expectations but the employer selectively punished the plaintiff, or punished the plaintiff more severely, for discriminatory reasons." *McNair v. Bonaventura*, 46 Fed. Appx. 849, 852 (7th Cir. 2002); *see also Curry v. Menard, Inc.*, 270 F.3d 473, 478 (7th Cir. 2001) (where plaintiff admitted that she violated defendant's policy but also claims that she was disciplined more harshly than non-black employees who also violated the policy, she does not need to show she was meeting employer's legitimate expectations to establish a prima facie case of discrimination). In such situations, the "legitimate expectations" element of the *prima facie* test dovetails with the issue of pretext. *Curry*, 270 F.3d at 478. The plaintiff still show that he was treated differently from similarly situated employees not in his protected class; Ramos cannot do that here, so his discrimination claim with regard to his termination fails.

### ii. Similarly Situated Employees

The similarly situated requirement in *McDonnell Douglas* entails a showing that the Plaintiff and the comparator employee dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 404-05 (7th Cir. 2007) (internal citations

omitted). In disciplinary cases in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason, a plaintiff must show that he is similarly situated to the comparator with respect to performance, qualifications, and conduct. *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617 (7th Cir. 2000).

At the same time, this requirement is a flexible one that considers "all relevant factors, the number of which depends on the context of the case," and is not "an unyielding, inflexible requirement that requires near one-to-one mapping between employees—distinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions." *Humphries*, 474 F.3d at 405. There is no requirement that a plaintiff show complete identity to a "similarly situated" employee; rather, the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination or retaliation. *Id.*; *see also South v. Illinois Environmental Protection Agency*, 495 F.3d 747, 752 (7th Cir. 2007). A single comparator will do; numerosity is not required. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 406-407 (7th Cir. 2007). Even using this flexible, common sense approach, this Court is unable to find that Plaintiff has offered any suitable comparators to meet his *McDonnell Douglas* requirement.

Plaintiff first offers as a comparator Peter Cortesi, a Caucasian crew leader who reported to the same supervisor as Plaintiff in the same reporting location. Plaintiff argues that Defendant treated Cortesi better by accepting Cortesi's callout exception form even though it was allegedly untimely. Generally, employees must report in writing any excuses for missed callouts to supervisors within ten calendar days of the weekly posting of ARCOS results. If the employee is

absent on the day of the weekly posting, the policy allows the employee ten calendar days upon return to work to report an excuse for a missed callout. Cortesi Dep. Ex. 3. Cortesi contended that he was absent because of illness from December 23-25, 2007 and submitted a callout exception form on January 5, 2008. Plaintiff speculates but offers no evidence that Cortesi's submission was untimely under the policies described above. Plaintiff also claims that his callout excuse submissions (to purportedly allow Plaintiff to care for his sick father) were ignored by Defendant, when in fact Plaintiff admits that he had never submitted such callout excuse forms to Defendant. Ramos Dep. 173:14-17. Cortesi does not therefore appear to have been treated any differently under the ARCOS policy, and Cortesi is not a suitable comparator.

Plaintiff also offers David Unrein as a comparator. Unrein is a Caucasian crew leader who has reported out of the Skokie location since 2003. Plaintiff argues that Unrein was able to reduce his disciplinary level one step by filing a grievance, but that Plaintiff's own grievance did not result in the reduction of his disciplinary level. Setting aside the more fundamental problem with this claim—that the basis for Plaintiff's grievance, that ComEd had allegedly skipped the three-day suspension step of discipline, was simply untrue, as described above—the problem here is that Plaintiff has not tendered sufficient evidence that he actually ever grieved his five-day suspension. ComEd claims to have no record of such a grievance. The only evidence Plaintiff offers is Plaintiff's wife's claim that Plaintiff's union steward Brian Willms had said he would file a grievance. Sherrie Ramos Dep. 96:2-97:14. This is textbook hearsay, insufficient to create a genuine issue regarding whether Plaintiff's five-day suspension had ever been properly contested for trial. Since Plaintiff has not shown that he actually grieved his five-day suspension, he cannot show that Unrein's grievance was more successful than his as a result of ComEd's discriminatory bias.

Plaintiff also offers as comparators Scott Puleo (or Puelo; the parties spell the name differently) and Eugene Lehn, two "substantially younger Caucasians" who were terminated under the ARCOS progressive discipline system but who were later reinstated. Plaintiff complains that he was not reinstated, so Puleo and Lehn must have been treated more fairly, but offers no identifying facts about the two, other than the quotation above. Defendant responds that Puleo and Lehn were reinstated in order to settle grievances filed by their union. Plaintiff offers no evidence that the reasons for their termination were similar nor that they had the same history of disciplinary problems. He also fails to show that he used the grievance process in the same way. Puleo and Lehn are clearly unsuitable as comparators.

The final comparator Plaintiff offers as evidence that his termination was the result of discriminatory bias is Andy Gerjol, a "Caucasian lineman substantially younger than Plaintiff." Pl.'s Resp. 9. Defendant admits that the disciplinary measures taken against Gerjol for his failure to meet ARCOS requirements was as follows: a formal warning, *two* one-day suspensions, and a three-day suspension. Gerjol essentially repeated one step of the progressive discipline system rather than advancing to the next. However, Gerjol is not a suitable comparator because he worked from a different reporting location under different supervisors than Plaintiff at the time the allegedly mistaken disciplinary measure was taken against him. DSOF ¶ 57-58. Even if Plaintiff had provided sufficient evidence to show that Gerjol was a suitable comparator, he has not show that a discriminatory reason more likely motivated Gerjol's aberrational discipline progression or that the ComEd's articulated reason for the employment action is unworthy of credence and is but a mere pretext for intentional discrimination. Defendant contends that this was an administrative mistake resulting from confusion in the ARCOS files surrounding Gerjol's January 2006 transfer from ComEd's Skokie/Highland Park

location to its Libertyville reporting location. Plaintiff simply replies that this argument does not "pass muster," but offers no other evidence suggesting that ComEd's explanation was pretextual.

Accordingly, because Plaintiff has offered no similarly-situated employees outside of the protected class were treated more favorably by ComEd, he has not met his burden of establishing a *prima facie* case of discrimination with respect to his termination.

### b. Other Alleged Incidents of Harassment and Discrimination

Plaintiff also claims that, unrelated to the callouts, he was subject to discriminatory discipline, job assignments, and harassment based upon his race, national origin, and age. Plaintiff appears to use these incidents only evidence of pretext with respect to his discharge, rather than asserting that these incidents are themselves actionable as discrimination claims. *See* Pl.'s Resp. 12 ("Defendant's proferred reason for its adverse employment action is mere pretext for a myriad of reasons."). For the reasons stated above, Plaintiff is unable to make a *prima facie* case of discrimination with respect to his termination, so the Court need not reach the pretext inquiry.

Even if the other alleged incidents of harassment and discrimination were treated as individual claims, none of these claims would survive summary judgment. First, Plaintiff claims that he was suspended in 2006 for allegedly threatening a supervisor, was required to retake the three-phase lineman's exam in 2006, and was suspended in 2007 for anti-authoritative behavior after refusing to take the lineman's exam and making threatening remarks to his supervisor. Plaintiff suggests that he was subject to this discipline while his Caucasian co-workers were not. Disparate discipline of an employee who is situated similarly to the plaintiff but is outside of the protected class may support an inference of discrimination. *See Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617-18 (7th Cir.2000). "Such a showing normally entails establishing that 'the two

employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.' " *Snipes v. Illinois Dep't of Corrections,* 291 F.3d 460, 463 (7th Cir.2002). Even if this Court believes Plaintiff's version of this story, as described in the facts section above, Plaintiff has not put forth any evidence that Defendant disciplined Plaintiff for a discriminatory reason or that Defendant's stated reasons for disciplining Plaintiff were pretextual. The precise question is not whether the employer's justification for the adverse action is a pretext, but whether it is "a pretext for the sort of discrimination prohibited by [Title VII]." *Greene v. Potter*, 557 F.3d 765, 769 (7th Cir. 2009) (quoting *McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. 1817); *see also Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[I]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (emphasis in original)). There is no evidence that Plaintiff was subjected to this discipline for any reason other than his inappropriate behavior. Also, Plaintiff offers no suitable comparators, only John Jackson, a "Caucasian lineman substantially younger than Plaintiff that Vojnikovic supervised," who swore at Vojnikovic. The details here are not sufficient to establish that Jackson is suitable as a comparator: namely, his age and, more importantly, whether he had a history of insubordination and threatening behavior, as Plaintiff admitted to having, are unknown.

Next, Plaintiff claims that Vojnikovic assigned Plaintiff to a disproportionate number of less desirable digging jobs. Plaintiff does not offer a precise breakdown of the jobs he was assigned and the jobs that his Caucasian co-workers were assigned, but instead offers his own

testimony and the testimony of his co-workers stating their opinions that Plaintiff was more frequently assigned to less desirable work. *See, e.g.*, Chandler Dep. at 13:22-14:18; Cortesi Dep. at 13:14-14:6. Plaintiff offers no specific comparators or specific facts, only impressions, which are insufficient to meeting his burden for overcoming summary judgment. Fed. R. Civ. P. 56(e). Even if the Court accepts arguendo that Plaintiff was disproportionately assigned to less desirable jobs, Plaintiff does not argue that Defendant's stated reason for the division of job assignments was illegitimate or pretextual. Plaintiff does not dispute that he was one of the least experienced crew leaders working out of the Skokie/Highland Park reporting location. DSOF ¶ 73. Vojnikovic states in his affidavit that Plaintiff typically took more time to set up and finish jobs compared to other crew leaders, and that Plaintiff did not have as much knowledge and understanding of electricity, technical procedures, and the grid and electrical system as other crew leaders. Vojnikovic Aff. ¶ 4; Cortesi Dep. 59:1-60:8. Plaintiff admits to having installed a high voltage cable on a transformer in a dangerous manner and not following Defendant's safety procedures. Just as with the disparate discipline allegations above, Plaintiff offers no evidence that Defendant's reasons for assigning Plaintiff to less desirable jobs was discriminatory or pretext for prohibited intentional discrimination.

Finally, Plaintiff offers numerous incidents of alleged discrimination and harassment. Plaintiff alleges that a co-worker once called him a "spook," and another co-worker drew a picture of a "black face" on the back of his bald head. Ramos Dep. 140:1-12, 142:1-143:24, 313:13-21, 315:16-316:2. Under Title VII, employer can be liable for co-worker harassment only if the employer was negligent in discovering or remedying the harassment. *Andonissamy v. Hewlett-Packard, Co.*, 547 F.3d 841, 848 (7th Cir. 2008). Plaintiff admits that he did not tell any

supervisors about the acts of harassment. DSOF ¶ 76-77; Ramos Dep. 313:13-21. Under these facts, no reasonable jury could hold Defendant liable for the actions of Plaintiff's co-workers.

## V. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is granted in its entirety.


    Enter:

                                        /s/ David H. Coar
                                        David H. Coar
                                        United States District Judge

Dated: August 20, 2009